UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LUIS R. MEDEIROS,
      Plaintiff,

      v.                                          CIVIL ACTION NO.
                                                  17-11675-PBS
COUNTRYWIDE HOME LOANS, INC. OF
VAN NUYS, CALIFORNIA, DIVISION OF
BANK OF AMERICA, N.A.; MTGLQ
INVESTORS, L.P. C/O RUSHMORE LOAN
MANAGEMENT SERVICES, LLC; and NATIONSTAR
MORTGAGE, LLC,
      Defendants.

**REPORT AND RECOMMENDATION RE:**
**DEFENDANTS COUNTRYWIDE HOME LOANS, INC. AND NATIONSTAR LLC'S**
**MOTION TO DISMISS THE COMPLAINT (DOCKET ENTRY # 21); MOTION TO**
**DISMISS OF DEFENDANT MTGLQ INVESTORS, L.P. C/O RUSHMORE LOAN**
**MANAGEMENT SERVICES, LLC (DOCKET ENTRY # 22)**

**July 3, 2018**

**BOWLER, U.S.M.J.**

      Pending before this court is a motion to dismiss filed by

defendants Countrywide Home Loans Inc. ("CHLI") and Nationstar

Mortgage, LLC ("Nationstar") (Docket Entry # 21) as well as a

motion to dismiss filed by defendant MTGLQ Investors, LP c/o

Rushmore Loan Management Services, LLC ("MTGLQ") (Docket Entry #

22).[1] Plaintiff opposes both motions.  (Docket Entry # 25).

After a hearing, this court took the motions (Docket Entry ##

21, 22) under advisement.

---

[1]  CHLI notes that plaintiff Luis R. Medeiros ("plaintiff")
improperly names CHLI as "Countrywide Home Loans, Inc. of Van
Nuys, California, A Division of Bank of America, N.A."  (Docket
Entry # 21).

PROCEDURAL BACKGROUND

Plaintiff initially filed a complaint on August 17, 2017 in Massachusetts Superior Court (Bristol County) alleging misconduct by CHLI, Nationstar, and MTGLQ ("defendants") in connection with four, separate mortgage loans plaintiff received in 2006. As set out in the pro se the complaint, defendants engaged in unfair and "predatory lending practices" by not modifying the loans in response to plaintiff's requests "over the years." (Docket Entry # 18). The lenders purportedly changed the terms of the loans, contrary to the broker's representation that "they would refinance these loans" in one year "to a fixed loan." (Docket Entry # 18). The broker, along with CHLI, "failed to disclose the effective" interest rate and the actual closing costs by changing "the terms at the very end" of the closing when plaintiff had "no time to inspect the documents." (Docket Entry # 18). Defendants also allegedly committed "financial fraud" by falsely depicting the property as "an existing condominium complex" in the loan documents when, in fact, the property "was a conversion." (Docket Entry # 18). Liberally reading and construing the allegations in the pro se complaint, it purports to set out a cause of action for fraud; unfair or deceptive act or practices in violation of Massachusetts General Laws chapter 93A ("chapter 93A"); and breach of contract.

On September 6, 2017, pursuant to 28 U.S.C. §§ 1332 and
1441(b), CHLI removed the case to this court.  (Docket Entry #
1).  CHLI, Nationstar, and MTGLQ presently move to dismiss all
of the claims (Docket Entry ## 21, 22), which plaintiff opposes
(Docket Entry # 25).  In the opposition to the motions,
plaintiff requests a six-month stay of foreclosure proceedings
and the ability to bring his cellular telephone into this
courthouse.  (Docket Entry # 25).  Because plaintiff filed the
opposition on October 11, 2017, the request to stay foreclosure
proceedings for six months, i.e., until Aril 11, 2018, is moot.
Plaintiff also fails to attach a certificate of service, see LR.
5.2(b), and there is no indication that plaintiff served this
motion on defendants.  See LR. 7.1(c).

STANDARD OF REVIEW

When considering a motion to dismiss under Fed. R. Civ. P.
12(b)(6) ("Rule 12(b)(6)"), a court "accept[s] as true all well
pleaded facts in the complaint and draw[s] all reasonable
inferences in favor of the plaintiffs." Gargano v. Liberty
International Underwriters, Inc., 572 F.3d 45, 48 (1st Cir.
2009).  "To survive a motion to dismiss, the complaint must
allege 'a plausible entitlement to relief.'" Fitzgerald v.
Harris, 549 F.3d 46, 52 (1st Cir. 2008).  While "detailed
factual allegations" are not required, "a plaintiff's
obligation to provide the 'grounds' of his 'entitlement for

3

relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atlantic v. Twombly</u>, 550 U.S. 554, 555 (2007); <u>Maldonado v. Fontanes</u>, 563 F.3d 263, 266 (1st Cir. 2009); <u>Thomas v. Rhode Island</u>, 542 F.3d 944, 948 (1st Cir. 2008). "[A] well-pleaded complaint may succeed even if . . . actual proof of those facts is improbable." <u>Bell Atlantic v. Twombly</u>, 550 U.S. at 556.

In evaluating a Rule 12(b)(6) motion, a court may also "consider 'documents the authenticity of which are not disputed by the parties'" as well as "'documents central to the plaintiffs' claim,'" such as the mortgage and the note at issue in this action, and "'documents sufficiently referred to in the complaint.'" <u>Curran v. Cousins</u>, 509 F.3d 36, 44 (1st Cir. 2007); <u>see also</u> <u>Trans-Spec Truck Service, Inc. v. Caterpillar Inc.</u>, 524 F.3d 315, 321 (1st Cir. 2008); <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993). CHLI and Nationstar attach the four, adjustable rate notes and the four mortgages, including riders, to their motion to dismiss. (Docket Entry ## 21-2 to 21-9). The pro se complaint refers to the mortgages and loans.

## FACTUAL BACKGROUND

Plaintiff owns property located at 375 Third Street in Fall River, Massachusetts ("the property"). (Docket Entry #

18).  In 2006, plaintiff converted the property into four, identical condominiums.  (Docket Entry # 18, ¶ 1).  Plaintiff is the sole trustee of this condominium complex.  (Docket Entry # 18, ¶ 9).  Defendants are the current loan servicers of the mortgages on plaintiff's property.[2]  (Docket Entry # 18).

In the summer of 2006, plaintiff and then wife, Anna Medeiros ("Medeiros"), contacted a mortgage broker to refinance a preexisting mortgage on the property.  (Docket Entry # 18, ¶ 1).  Plaintiff and Medeiros "were looking to get one mortgage that covered [all] four condominiums."  (Docket Entry # 18, ¶ 1).  They had "already" completed "the legal documents for the conversion."  (Docket Entry # 18, ¶ 1).  The broker informed plaintiff that each condominium required a separate loan.  (Docket Entry # 18, ¶ 1).  To offset the closing costs, the broker offered plaintiff a mortgage that required a monthly payment of only $300 less than the preexisting mortgage loan.  (Docket Entry # 18, ¶ 1).  The broker stated that plaintiff and Medeiros could refinance into "a fixed rate loan" if they

---

[2]  The complaint states that, "although there have been other lenders or servicers involved with these units, named here are the current servicers/owners of said mortgages of said properties, to my knowledge."  (Docket Entry # 18).  The complaint identifies CHLI as the original lender and an unidentified broker as failing to disclose the interest rate and misrepresenting the ability to refinance into a fixed rate loan if plaintiff still owned the property in a year.  (Docket Entry # 18).

"still had them in one year."[3]  (Docket Entry # 18, ¶ 1).

Plaintiff provided all "financial verification documents to

prove" he and his wife "had sufficient equity" and "liquid cash

as reserves."  (Docket Entry # 18, ¶ 1).

The closing took place at plaintiff's residence on the

evening of June 9, 2006.  (Docket Entry # 18, ¶ 1).  Plaintiff

signed four promissory notes ("the Notes"), one per unit, each

in the amount of $111,300 to Countrywide Bank, N.A.

("Countrywide").  (Docket Entry ## 21-2, 21-4, 21-6, 21-8).  On

the same day, plaintiff signed four separate mortgages ("the

Mortgages") securing the Notes.[4]  (Docket Entry ## 21-3, 21-5,

21-7, 21-9).

Under the terms of the Notes, plaintiff promised to pay

$397.61 in monthly payments "on the first day of each month

beginning on August 1, 2006" in the form of "cash, check or

money order."  (Docket ## 21-2, 21-4, 21-6, 21-8).  The Notes

also provide that, if plaintiff does not pay "the full amount

of each Minimum Payment on the date it is due, [he] will be in

default."  (Docket ## 21-2, 21-4, 21-6, 21-8).  The Notes

allowed a 15-day grace period before applying a late charge.

---

[3]  As set forth in the complaint, this is when the predatory
lending tactics commenced.  The broker and CHLI purportedly
failed to disclose or "hid" the "effective interest rate" and
denied plaintiff and Medeiros the ability to refinance the loan
a year later.  (Docket Entry # 18, ¶ 1).
[4]  Each mortgage refers to the mortgage as a "security
instrument."  (Docket ## 21-3, 21-5, 21-7, 21-9).

The relevant language states that, "If the Note Holder has not received the full amount of any Minimum Payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder." (Docket ## 21-2, 21-4, 21-6, 21-8).

Each of the four mortgages carried an adjustable interest rate with an initial interest rate of 8.125% and a maximum rate of 9.95%. (Docket Entry ## 21-2, 21-4, 21-6, 21-8). Plaintiff incurred roughly $7,000 in closing costs for each loan. (Docket Entry # 18, ¶ 1). The Notes specify that the initial interest rate may change on the "first day of August, 2006, and on that day every month thereafter . . . . The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3."[5] Plaintiff attests that the broker changed the terms of the agreement "at the very end" of the closing and failed to disclose the effective interest rate. (Docket Entry # 18, ¶ 1). Due to these last minute changes and because the closing took place at night, plaintiff did not have time to inspect the documents before closing on the loans. (Docket Entry # 18, ¶ 1). He did, however, initial each page of the Mortgages and Notes, as well as the attached adjustable

---

[5]  The Note refers to each date on which the interest could change as an "Interest Rate Change Date." (Docket Entry # 21-2, p. 2).  Section three states that the adjustable rate is based on an "Index." (Docket Entry # 21-2, p. 2).

rate rider.  (Docket Entry ## 21-2, 21-4, 21-6, 21-8).

The Mortgages identify plaintiff and Medeiros as the borrower and the mortgagor, and Countrywide as the lender. (Docket Entry ## 21-3, 21-5, 21-7, 21-9).  The first page of each mortgage names Mortgage Electronic Registration Systems, Inc. ("MERS") as a "corporation that is acting solely as a nominee for Lender '(Countrywide)' and the Lender's successors and assigns."  (Docket Entry ## 21-3, 21-5, 21-7, 21-9).  The Mortgages also state that, "MERS is the mortgagee under this Security Instrument."  (Docket Entry ## 21-3, 21-5, 21-7, 21-9).

Under the Mortgages, MERS, as mortgagee, held only legal title to the interests granted by the Medeiros' in the security instrument.  (Docket Entry ## 21-3, 21-5, 21-7, 21-9).  The Mortgages gave MERS, as holder of legal title, the right to exercise the interests granted by plaintiff and Medeiros in each mortgage, including the right to foreclose and sell the property.  (Docket Entry ## 21-3, 21-5, 21-7, 21-9).  The relevant language reads as follows:

> Borrower understands and agrees that MERS holds only legal title to the interests granted by the Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:  to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

(Docket Entry ## 21-3, 21-5, 21-7, 21-9).

The Mortgages also gave MERS, as mortgagee, the power of sale and the authority to assign each mortgage.  (Docket Entry ## 21-3, 21-5, 21-7, 21-9).  The relevant language in the agreement states that:

> Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the County of Bristol . . ..

(Docket Entry ## 21-3, 21-5, 21-7, 21-9).

Each of the Mortgages secured to Countrywide, as the lender, "the repayment of the loan."[6]  (Docket Entry ## 21-3, 21-5, 21-7, 21-9).  Under the Mortgages, plaintiff and Medeiros agreed that the Note "together with" the Mortgage "can be sold one or more times without prior notice to the Borrower." (Docket Entry # 21-3, 21-5, 21-7, 21-9).  The Notes, in turn, allowed the lender, Countrywide, to transfer the Notes without prior notice to plaintiff.  (Docket Entry # 21-3, 21-5, 21-7, 21-9).  The Notes identify Countrywide as both the lender and a "Note Holder."[7]  (Docket Entry ## 21-2, 21-4, 21-6, 21-8).

The Mortgages contained a provision that required owner-

---

[6]  The Mortgages define the "Loan" as "the debt evidenced by the Note."  (Docket Entry ## 21-3, 21-5, 21-7, 21-9).

[7]  The Notes further state that anyone who takes the note by transfer is also a "Note Holder."  (Docket Entry ## 21-2, 21-4, 21-6, 21-8).

occupancy of the property unless the Lender agreed otherwise.

The relevant language states as follows:

> Borrower shall occupy, establish, and use the Property as
> Borrower's principal residence within 60 days after the
> execution of this Security Instrument and shall continue
> to occupy the Property as Borrower's principal residence
> for at least one year after the date of occupancy, unless
> Lender otherwise agrees in writing, which consent shall
> not be unreasonably withheld, or unless extenuating
> circumstances exist which are beyond Borrower's control.

(Docket Entry ## 21-3, 21-5, 21-7, 21-9).  In a Family Rider
attached to each Mortgage, it provides that, "Unless Lender and
Borrower otherwise agree in writing, Section 6 concerning
Borrower's occupancy of the Property is deleted."  (Docket
Entry ## 21-3, 21-5, 21-7, 21-9).  Hence, the Mortgages did not
require owner-occupancy.[8]

The Mortgages listed Countrywide as the original lender of
plaintiff's four loans.  (Docket Entry ## 21-3, 21-5, 21-7, 21-
9).  The Mortgages state that, "If there is a change of the
Loan Servicer, Borrower will be given written notice of the
change which will state the name and address of the new Loan
Servicer."[9]  (Docket ## 21-3, 21-5, 21-7, 21-9).

_____

[8]  In opposition to the motion to dismiss, plaintiff states that
"he could not qualify for HAMP modifications" because "he was an
investor."  (Docket Entry # 25, p. 2).  This statement is not
considered part of the Rule 12(b)(6) record.  The Mortgages and
riders, however, establish that the properties did not require
the owner's occupancy and assigned all rents to the lender.
[9]  The Mortgages define "Loan Servicers" as the entity "that
collects Periodic Payments due under the Note and this Security
Instrument and performs other mortgage loan servicing

10

One year after the closing, plaintiff and Medeiros attempted to refinance in accordance with the aforementioned promise made by the broker regarding the transition to a fixed interest rate loan. (Docket # 18, ¶ 1). Plaintiff provided "full documentation" to the lender, identified in the complaint as CHLI. (Docket # 18, ¶ 1). The lender denied the request even though plaintiff paid each loan "on time and in full." (Docket # 18, ¶ 1).[10] Plaintiff subsequently submitted numerous modification requests to CHLI and the current defendants "over the years."[11] (Docket # 18, ¶ 1). Each time plaintiff requested a modification, the loan servicing departments denied the request and failed to provide a timely response. (Docket # 18, ¶ 6).

Plaintiff claims that CHLI promised to keep all four loans in its portfolio. (Docket # 18, ¶ 4). Sometime after the June 2006 closing, however, Bank of America acquired the "servicing arrangements" from Countrywide. (Docket Entry # 18, ¶ 4). Although CHLI informed plaintiff that it would "keep all four loans in [its] portfolio," Bank of America subsequently sold

_____

obligations under the Note, this Security Instrument, and Applicable Law." (Docket ## 21-3, 21-5, 21-7, 21-9).
[10] Plaintiff notes that up to this date, plaintiff and Medeiros paid their loans "on time and in full." (Docket # 18, ¶ 1).
[11] The complaint states that plaintiff sent refinancing and modification requests to "Countrywide then Bank of America then Everhome Mortgage and eventually the current defendants . . .." (Docket Entry # 18).

these loans to three different lenders.[12]  (Docket Entry # 18, ¶ 4).

The new servicers "changed the effective interest rate and servicing arrangements."  (Docket # 18, ¶ 5).  In particular, the new lenders and/or servicers did not have a "storefront local institution" for plaintiff to visit and their grace period of 15 days charged a fee to pay the loans by telephone or on the internet.  (Docket # 18, ¶ 5).  The original servicing arrangements allowed plaintiff to pay up until the grace period with no added fees.  (Docket # 18, ¶ 5).

According to the complaint, plaintiff informed the original lender that the property was a condominium conversion. (Docket # 18, ¶ 3).  Plaintiff alleges the lenders "falsified that" the property was "an existing condominium complex." (Docket # 18, ¶ 3).  This enabled the lenders to sell the mortgage loans to Fannie Mae under the guise that the property or properties met the required government standards for a complex of condominium units.[13]  (Docket # 18, ¶ 3).  Plaintiff claims that "[t]his act" prevented him from receiving a loan

---

[12]  Bank of America therefore allegedly breached the original agreement of servicing plaintiff's four loans together.  (Docket # 18, ¶ 4).  The complaint does not specify which of the mortgage loans Bank of America sold, nor does it identify the three lenders.

[13]  The complaint does not specify which mortgages were sold to Fannie Mae, nor when they were sold.

modification because the condominium units did not satisfy "Fannie Mae guidelines" or loan requirements.[14]  (Docket # 18, ¶ 3).

On August 8, 2013, MERS, as nominee for Countrywide, assigned the mortgage on Unit 1 to Green Tree Servicing, LLC ("Green Tree").  (Docket Entry # 23-1, p. 35).  On August 18, 2016, Ditech Financial, LLC, successor by merger to Green Tree, assigned the mortgage on Unit 1 to MTGLQ.  (Docket Entry # 23-1, p. 38).  The 2016 assignment to MTGLQ was recorded at the Bristol Fall River Registry of Deeds on October 3, 2016. (Docket Entry # 23-1, p. 37).[15]

At an undetermined point in time, plaintiff discontinued his monthly payments on the mortgage.  Plaintiff discontinued the payments because "there was no need to keep putting more money into [the] complex until [the] stability of [the] economy improved."  (Docket Entry # 18, ¶ 1).  Because of the financial crisis, the value of the property decreased substantially.  He continued to pay the property's insurance and maintenance fees.[16]  (Docket Entry # 18, ¶ 7).  In response to plaintiff's

---

[14]  Plaintiff admits that the "condominium Trust has never met any guidelines of any government mortgage entity."  (Docket # 18, ¶ 3).
[15]  MTGLQ provided documentation to prove that it is the current holder of the mortgage on Unit 1.
[16]  As indicated above, there is no documentation specifying the date of plaintiff's default.

decision to cease monthly payments, defendants have threatened and proceeded with foreclosure. (Docket Entry # 18, ¶ 8). Plaintiff and Medeiros have since divorced.[17] Plaintiff was also diagnosed with vocal cord cancer, causing his health to suffer over the past two years. As a result, plaintiff has been drained "financially and emotionally." (Docket Entry # 18, ¶ 2).

DISCUSSION

## I.  Violation of Chapter 93A

Defendants initially move to dismiss the chapter 93A claim because it is untimely with respect to the alleged unfair and "predatory lending practices" surrounding the origination of the Mortgages. (Docket Entry ## 21-1, 23). Allegations that fall into this category are the broker's failure "to disclose the effective interest rate" and the actual closing costs by changing "the terms at the very end" of the closing; the lender's failure to modify the loans in response to plaintiff's requests "over the years"; and the lenders' conduct in purportedly changing the terms of the loans, contrary to the broker's representation that "they would refinance these loans" in one year "to a fixed loan." (Docket Entry # 18).

---

[17]  Plaintiff and Medeiros' divorce was finalized in 2014. In the divorce proceedings, the Probate Court awarded the four condominiums to plaintiff. (Docket Entry # 25, p. 1). This statement is not considered part of the Rule 12(b)(6) record.

The statute of limitations for consumer protection claims brought pursuant to chapter 93A is 4 years.  Mass. Gen. Laws ch. 260, § 5A.  The cause of action "accrues 'when the plaintiff knew or should have known of the appreciable harm resulting from the defendant's [actions].'"  Azevedo v. U.S. Bank N.A., 167 F. Supp. 3d 166, 170 (D. Mass. 2016) (quoting Maldonado v. AMS Servicing LLC, 2012 WL 220249, at *5 (D. Mass. Jan. 24, 2012)).

Massachusetts law nevertheless tempers the four-year limitations period with the "discovery rule."  See Bernier v. The Upjohn Company, 144 F.3d 178, 180 (1st Cir. 1998).  The discovery rule provides that, "a cause of action accrues, and the statute of limitations begins to run, when a plaintiff knows or reasonably should know that she may have been harmed by a defendant's conduct, even if the harm actually occurred earlier."  RTR Technologies, Inc. v. Helming, 707 F.3d 84, 89 (1st Cir. 2013).  The discovery rule pertains only to those plaintiffs whose injuries are "inherently unknowable."  Id. (quoting Patsos v. First Albany Corp., 741 N.E.2d 841, 846 (Mass. 2001)).  Absent actual knowledge, "[t]he factual basis for a cause of action is inherently unknowable if it is incapable of detection by the wronged party through the exercise of reasonable diligence."  Geo. Knight & Company, Inc. v. Watson Wyatt & Company, 170 F.3d 210, 213 (1st Cir. 1999)

(internal quotation marks omitted).

Here, plaintiff and Medeiros entered into the four mortgage loans on the evening of June 6, 2006. Ordinarily, a violation involving issuance of a loan begins to accrue from the moment the parties entered into the loan. See Azevedo v. U.S. Bank N.A., 167 F. Supp. 3d at 170. The chapter 93A claim thus accrued on June 6, 2006 and expired four years later on June 6, 2010. Plaintiff did not file the instant complaint asserting the chapter 93A claim against the defendants until August 17, 2017—more than seven years after the limitations period.

Additionally, application of the discovery rule does not toll the statute of limitations. The effective interest rate and the terms of the agreement, which plaintiff alleges are what made the loans predatory, were set out in the original Mortgages signed by plaintiff in 2006.[18] In fact, plaintiff initialed the page of the adjustable rate rider and signed the signature page of the rider. (Docket Entry # 21-3, 21-5, 21-7, 21-9). Accordingly, plaintiff knew or should have known about the interest rate and the material terms of the agreement at or around the time he signed the Mortgages. See Hull v. Attleboro

---

[18] The Mortgages indicate that the loans carried an adjustable rate with an initial interest rate of 8.125% and a maximum rate of 9.95%. (Docket Entry ## 21-2, 21-4, 21-6, 21-8).

Sav. Bank, 596 N.E.2d 358, 362 (Mass. App. Ct. 1992) ("[o]ne who signs a writing that is designed to serve as a legal document, as this and its enclosure were, is presumed to know its contents"). Even assuming that plaintiff did not and could not have known of the "appreciable harm" caused by the terms of the agreement because of his inability to inspect the documents prior to the closing, the latest date that plaintiff would realize the harm is one year later on June 6, 2007, when the lenders refused to refinance to a fixed rate loan. This refusal to refinance and modify the Mortgages as allegedly promised would prompt a reasonable person to inquire into a possible injury at the hands of defendants. As such, the chapter 93A claim relating to the "predatory" and "unfair" lending practices surrounding the origination of the Mortgages is time barred as a matter of law.

As an alternative basis to dismiss the chapter 93A claim, defendants submit that they cannot be held liable under the statute for Countrywide's conduct in originating the Notes and Mortgages merely by virtue of their status as assignees of the Mortgages and successors in interest to the lender. See Azevedo v. U.S. Bank N.A., 167 F. Supp. 3d at 170 (citing Serra v. Quantum Servicing Corp., 747 F.3d 37, 41 (1st Cir. 2014)); see also Drakopoulos v. U.S. Bank Nat'l Ass'n, 991 N.E.2d 1086, 1095 (Mass. 2013) (when "assignee played no part in the unfair

17

or deceptive acts of an assignor, principles of assignee liability ordinarily will not render the assignee liable for affirmative damages for those acts"). Each of the four Mortgages designate Countrywide as the original lender. (Docket Entry ## 21-3, 21-5, 21-7, 21-9). The complaint also states that, "Although there have been other lenders or servicers involved with these units, named here are the current servicers/owners of said mortgages of said properties." (Docket Entry # 18). To the extent plaintiff seeks to hold defendants liable for unfair, predatory lending surrounding the origination of the Mortgages merely by virtue of their status as assignees and/or successors in interest to Countrywide, such a claim fails.[19]

II. <u>Fraud</u>

Defendants next move to dismiss the fraud claim because the complaint fails to allege sufficient, particular facts under Fed. R. Civ. P. 9(b) ("Rule 9(b)"). The complaint sets out three allegations of fraudulent misrepresentation on the part of defendants: (1) the broker's decision to change the terms of the Mortgages without informing plaintiff; (2) the lenders' false depiction of the property as "an existing

_____

[19] In light of the recommended dismissal of the chapter 93A claim based on the foregoing arguments, it is not necessary to address defendants' alternative argument for dismissal regarding the chapter 93A demand letter.

condominium complex" in the loan documents when, in fact, the property "was a conversion"; and (3) the lenders' involvement in dishonest efforts to modify the loans.  (Docket Entry # 18). Defendants maintain that the complaint does not meet the heightened pleading standards required under Rule 9(b) because it does not identify the "who, what, when, where, and how details of any alleged activities" by defendants, "let alone any alleged fraud."  (Docket Entry # 21-1, p. 10).

In order to plead a plausible claim for common law fraud, Massachusetts law requires:  "(1) that the statement was knowingly false; (2) that defendants made the false statement with the intent to deceive; (3) that the statement was material to the plaintiffs' decision; (4) that the plaintiffs reasonably relied on the statement; and (5) that the plaintiffs were injured as a result of their reliance."  Juarez v. Select Portfolio Servicing, Inc., 708 F.3d 269, 279 (1st Cir. 2013) (suit by homeowner alleging wrongful foreclosure by mortgagee's assignee and mortgage servicer).  Furthermore, a fraud claim must also satisfy the particularity requirements set forth in Rule 9(b), mandating "specifics about the time, place, and content of the alleged false representations."  Id. at 279-80 (quoting United States ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 731 (1st Cir. 2007)).  Thus, the complaint must specify: "(1) the allegedly fraudulent statements; (2) the identity of

the speaker; (3) where and when the statements were made; and
(4) why the statements were fraudulent." S.E.C. v. Druffner,
353 F. Supp. 2d 141, 148 (D. Mass. 2005).

As to the broker's decision to change the terms of the
Mortgages without informing plaintiff, the complaint states
that plaintiff and Medeiros "contacted a mortgage broker to
refinance a mortgage," that "[t]he broker took our
application," and that "[t]he broker, said he could, then he
changed the terms at the very end without informing us prior to
closing the deal." (Docket Entry # 18).  The complaint does
not specify which terms the broker altered prior to the
closing, nor does it provide the name of the broker and for
whom the broker worked.  Accordingly, this allegation fails to
satisfy the particularity requirements set forth in Rule 9(b).

Turning to the second allegation in the fraud claim, the
complaint states that the lenders "falsified that [plaintiff's]
properties were an existing condominium complex . . . They then
sold them to Fannie Mae, under the false guise that they met
government guidelines for such a complex of units." (Docket
Entry # 18, ¶ 3).  Defendants argue that this allegation also
does not satisfy Rule 9(b).  (Docket Entry ## 21-1, 23).
Indeed, the complaint does not specify how such falsification
occurred, who falsified that the properties were an existing
condominium complex, which defendant(s) conducted the

falsification, and when this falsification occurred. Additionally, the complaint fails to provide a date for when the sale to Fannie Mae took place.  As such, the second allegation is insufficient under Rule 9(b).

Finally, defendants argue that the third allegation as to the fraudulent misrepresentation claim is not plead with the requisite specificity to satisfy Rule 9(b).  (Docket Entry ## 21-1, 23).  The complaint states that "loan servicing departments were involved in dishonest efforts to modify these loans."  (Docket Entry # 18, ¶ 6).  The complaint explains that each time plaintiff requested a modification, he received the "run around" and that these loan servicing departments "would get documents, [and] take weeks on end to finally say, no." (Docket Entry # 18, ¶ 6).  Again, this allegation fails to identify which "loan servicing departments" were dishonest, when the above instances took place, and why the delayed responses are considered fraudulent.  Accordingly, the third allegation of fraudulent misrepresentation does not satisfy Rule 9(b)'s particularity requirements.  Because the allegations that make up the fraud claim do not contain specifics outlining the time, place, and content of the alleged false representations, the claim is subject to dismissal.

In the alternative, defendants assert that the fraud claim is time barred.  The relevant statute of limitations for fraud

21

in Massachusetts is three years.  Mass. Gen. Laws ch. 260, §
2A; Pilalas v. Cadle Co., 695 F.3d 12, 14 (1st Cir. 2012)
("limitations period under [Massachusetts] law is three years
for fraud claims").  In cases of fraudulent misrepresentation,
the cause of action accrues at the time plaintiff learned or
reasonably should have learned of the misrepresentation.  Kent
v. Dupree, 429 N.E.2d 1041, 1043 (Mass. App. Ct. 1982); see
also Rodi v. S. New Eng. Sch. of Law, 389 F.3d 5, 17 (1st Cir.
2004) ("claim for fraudulent misrepresentation does not begin
to accrue until 'a plaintiff learns or reasonably should have
learned of the misrepresentation'").

     As with the chapter 93A claim, the three-year limitations
period for a fraud claim "begins to run 'when a plaintiff
discovers, or any earlier date when she should reasonably have
discovered, that she has been harmed or may have been harmed by
the defendant's conduct.'"  Epstein v. C.R. Bard, Inc., 460
F.3d 183, 187 (1st Cir. 2006).  Under the discovery rule, "the
limitations period is tolled until 'events occur or facts
surface which would cause a reasonably prudent person to become
aware that she or he had been harmed.'"  Id. (quoting Bowen v.
Eli Lilly & Company, Inc., 557 N.E.2d 739, 741 (Mass. 1990)).
"A plaintiff is considered to be on 'inquiry notice' when the
first event occurs that would prompt a reasonable person to
inquire into a possible injury at the hands of the defendant."

Id.

In the case at bar, plaintiff was an alleged victim of fraudulent misrepresentation when the broker changed the terms of the Mortgages at the closing without giving plaintiff time to inspect the documents.  (Docket Entry # 18).  This alleged misrepresentation occurred at or around the origination of the loans on June 6, 2006.  (Docket Entry # 18).  As explained with respect to the chapter 93A claim, the closing took place 11 years prior to the August 17, 2017 filing of this action and eight years after the expiration of the limitations period.

Additionally, plaintiff had actual knowledge of the terms of the Mortgages at the time of the closing.  As noted above, both plaintiff and Medeiros initialed each page of both the Mortgages and the Notes, as well as signed the signature page at the end of both agreements.  See Hull v. Attleboro Sav. Bank, 596 N.E.2d at 362.  Because plaintiff reasonably should have learned of the material terms of the Mortgages and Notes at the time of the closing, the discovery rule does not toll the cause of action.  Accordingly, the fraud claim with respect to the foregoing allegation that the broker changed the terms of the Mortgages is subject to dismissal as untimely.[20]

---

[20]  In light of the recommended Rule 9(b) dismissal of the other allegations in the fraud claim, it is not necessary to address the remaining allegations as untimely.

III.  Breach of Contract

Liberally construing the breach of contract claim, it is based on the broker's promise to refinance the loans in 2007 and CHLI's promise to keep all four loans together in its portfolio.  (Docket Entry # 18).  Specifically, the complaint asserts that the broker "told us they would refinance these loans if we still had them in one year, to a fixed rate loan," and that CHLI "promised [him] to keep all four loans in their portfolio, because of their unique situation."  (Docket Entry # 18, ¶¶ 1, 4).  The complaint asserts that these respective promises were breached when CHLI refused to refinance the loans in 2007; when the loans were sold to Fannie Mae; and when Bank America "sold these loans to three different lenders" despite "the original agreement of servicing them together."  (Docket Entry # 18, ¶¶ 1-4).

Defendants initially seek to dismiss the breach of contract claim in relation to CHLI's refusal to refinance the loans in 2007 on the ground that it is time barred.  (Docket Entry # 21-1, 23).  Massachusetts has a six-year limitations period for a breach of contract claim, which begins after "the [cause of action] accrues."  Mass. Gen. Laws ch. 260 § 2; Callahan v. Wells Fargo & Co., 747 F. Supp. 2d 247, 252 (D. Mass. 2010).  A cause of action usually accrues at the time of the breach.  Cambridge Plating Co., Inc. v. Napco, Inc., 991

24

F.2d 21, 25 (1st Cir. 1993).  As previously indicated, the discovery rule ensures fairness by providing that, "regardless of the actual time of breach or injury, a cause of action does not accrue until a plaintiff discovers, or reasonably should have discovered, that she may have been injured as a result of the defendant's conduct."  Id.

The complaint asserts that CHLI "told us they would refinance these loans if we still had them in one year, to a fixed rate loan."  (Docket Entry # 18, ¶¶ 1, 4).  Defendants are correct in pointing out that by plaintiff's own account, the alleged breach related to the promise to refinance would have occurred one year from the origination of the loans, after CHLI allegedly refused to refinance the loans.  (Docket Entry ## 21-1, 23).  Upon the lender's failure to refinance the loans the following year in 2007, plaintiff knew or should have known at this point in time that he may be injured as a result of the lender's conduct.  Therefore, the cause of action for any breach of contract based on the failure to refinance accrued one year after the origination of the loans in 2007 and subsequently expired in 2013.  As plaintiff did not bring this suit until August 17, 2017, the breach of contract claim in relation to the promise to refinance is time barred as a matter of law.  (Docket Entry # 18).

Defendants next submit that the statute of frauds,

25

Massachusetts General Laws chapter 259, section one, bars enforcement of both the promise to refinance and the promise to service the loans together. (Docket Entry ## 21-1, 23). In support of their argument, defendants assert that plaintiff neither provides a writing that memorializes these promises nor alleges that the Notes or Mortgages included provisions requiring the lender to refinance after one year or to keep the loans with the same servicer. (Docket Entry ## 21-1, 23).

The Massachusetts statute of frauds provides that, "No action shall be brought . . . [u]pon a contract for the sale of lands, tenements or hereditaments or of any interest in or concerning them . . . unless the . . . contract upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized." Mass. Gen. Laws ch. 259, § 1; French v. Chase Bank, N.A., 2012 WL 273724, at *4 (D. Mass. Jan. 31, 2012). Under Massachusetts law, "An agreement to give or assign a mortgage is an agreement to convey an interest in land and, to be enforceable, must be in writing." French v. Chase Bank, N.A., 2012 WL 273724, at *2. Thus, a contract affecting a mortgage falls squarely within the statute. Id.

"When a party seeks to enforce an alleged oral contract that is within the statute of frauds, he must not only prove

the existence of the oral contract itself, but he must go one
step further and prove a memorandum in writing containing the
terms of that same oral contract in so far as he seeks to
enforce them." Fichera v. City of Lawrence, 44 N.E.2d 779, 780
(Mass. 1942) (citation to statute of frauds omitted).  In order
to satisfy the statute, the written memorandum must correctly
state "the oral undertaking of the party sought to be charged."
Epdee Corp. v. Richmond, 75 N.E.2d 238, 239 (Mass. 1947); see
Harrington v. Fall River Housing Authority, 538 N.E.2d 24, 29
(Mass. App. Ct. 1989) (memorandum "must contain all the
provisions of the oral contract with which the plaintiff is
seeking to charge the defendant"); see also Simon v. Simon, 625
N.E.2d 564, 567 (Mass. App. Ct. 1994) (writing must set out the
essential provisions of the oral agreement).  To comply with
the statute of frauds, the written memorandum must:  "(1)
reasonably identify the subject matter of the contract, (2)
indicate that a contract with respect to this subject matter
has been made between the parties, (3) state with reasonable
certainty the essential terms of the unperformed promises in
the contract, and (4) be signed by or on behalf of the party to
be charged." Trenwick America Reinsurance Corp. v. IRC, Inc.,
764 F. Supp. 2d 274, 298-299 (D. Mass. 2011) (citing
Massachusetts cases).  Finally, "under Massachusetts law,
multiple documents pertinent to a transaction may be read

27

together in determining whether the statute of frauds has been satisfied." Blackstone Realty LLC v. F.D.I.C., 244 F.3d 193, 198 n.4 (1st Cir. 2001); see In re Rolfe, 710 F.2d 1, 3 (1st Cir. 1983) ("written memorandum 'may consist of several writings' as long as they 'clearly indicate that they relate to the same transaction'").

Defendants correctly state that any alleged promises referenced by plaintiff must be reduced to writing to satisfy the statute of frauds because the contracts in this case involve an interest in real property. See French v. Chase Bank, N.A., 2012 WL 2273724, at *1. As such, plaintiff must provide evidence of a written memorandum containing terms of both the broker's promise to refinance the loans after one year, as well as CHLI's promise to service all four loans together. Plaintiff, however, fails to include any written contract that memorializes these promises. Further, the Notes and Mortgages do not include any contractual obligations on the lender's part to refinance after one year or service the loans together. To the contrary, the Mortgages allow assignment of the loans without prior notice to the borrower.[21] The statute of frauds therefore bars the contract claims pertaining to

---

[21] The relevant language in the Mortgages states, "The Note or partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to the Borrower." (Docket Entry ## 21-3, 21-5, 21-7, 21-9).

refinancing and servicing all four loans together in CHLI's portfolio.  These aspects of the breach of contract claim are therefore subject to dismissal.

Finally, CHLI and Nationstar move to dismiss the breach of contract claim because the complaint fails to sufficiently allege all the elements of a plausible contract claim, including the essential terms of the contract and his performance under it.[22]  See Bou-Nassif v. Bank of America, N.A., 99 F. Supp. 3d 220, 223 (D. Mass. 2015).  A breach of contract under Massachusetts law "requires the plaintiff to show that (1) a valid contract between the parties existed; (2) the plaintiff was ready, willing, and able to perform; (3) the defendant was in breach of the contract; and (4) the plaintiff sustained damages as a result."  Bose Corp. v. Ejaz, 732 F.3d 17, 21 (1st Cir. 2013).  In short, the plaintiff must show that a valid "contract existed, the defendant breached the terms of the contract, and the plaintiff sustained damages as a result of the breach."  Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 232 (1st Cir. 2013) (internal brackets omitted).

As previously noted, there are no provisions included in the Notes and Mortgages that required the lenders to modify the loans or barred the loans from being serviced together.

---

[22]  MTGLQ does not address the failure to allege all the elements of a contract claim as a basis for dismissal in its memorandum.

Additionally, because no terms exist in the Notes and Mortgages mandating the above actions, defendants did not breach these contracts by denying plaintiff's modification requests and selling the loans to Fannie Mae.  Thus, the complaint fails to plausibly allege that a valid contract exists pertaining to the alleged oral promises and that defendants were in breach. Accordingly, CHLI's and Nationstar's final argument provides an additional basis for dismissal of the breach of contract claim.

<u>CONCLUSION</u>

In accordance with the foregoing discussion, this court **RECOMMENDS**[23] that the motions to dismiss (Docket Entry ## 21 & 22) be **ALLOWED.**

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[23]  Any objection to this Report and Recommendation must be filed with the Clerk of the Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  <u>See</u> Fed. R. Civ. P. 72(b).  Any party may respond to another party's objection within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.